IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASPEN RESOURCE GROUP, LLC; | CIVIL ACTION |
| Plaintiff, | No. |
| v. | |
| CWCAPITAL ASSET MANAGEMENT LLC; | |
| Defendant. | |

## COMPLAINT

Plaintiff Aspen Resource Group, LLC ("**Aspen**" or "**Plaintiff**") hereby submits this Complaint and, in support thereof, avers as follows:

1. This is a claim by Aspen against defendant CWCapital Asset Management, LLC ("**CWCAM**") for, *inter alia,* various breaches of a written integrated Tax Consulting Agreement effective as of April 3, 2009 (the "**Agreement**") and a declaration of Aspen's rights under the Agreement.

2. CWCAM has wrongfully breached the Agreement by, *inter alia*:

   a) Failing to pay invoices for work completed by Aspen;

   b) Declaring its intention to not pay future invoices for work completed by Aspen;

   c) Refusing to acknowledge its obligations to pay Aspen for amounts that are currently and/or potentially due to Aspen pursuant to the Agreement by unilaterally imposing conditions on payment that are not consistent with the terms of the Agreement;

        d)      Refusing to allow Aspen to continue working on matters that were in progress when CWCAM terminated the Agreement, when CWCAM was required to do so pursuant to both (i) the express language of the Agreement and (ii) the duty of good faith and fair dealing that is imposed on CWCAM pursuant to the Agreement; and

        e)      Refusing to reimburse Aspen for fees and costs that Aspen advanced for CWCAM's benefit and on CWCAM's behalf.

3.      As a result of CWCAM's breaches, Aspen has suffered substantial monetary losses and the loss of business opportunities and fees that were provided by the Agreement.

4.      Further, because the amounts that are due and payable to Aspen under the Agreement are often dependent upon the occurrence and verification of the continued benefit resulting from Aspen's work in future years, and because Aspen has not yet fully invoiced CWCAM for all of the amounts currently or potentially due under the Agreement, Aspen will continue to suffer additional monetary losses absent the entry of declaratory relief from this Honorable Court, including, but not limited to:

        a)      Fees earned by Aspen for tax assessment reductions for properties owned or serviced by CWCAM that were realized through Aspen's efforts pursuant to Agreement and remain applicable to (and thus billable for) future tax years; and

        b)      Reimbursements due to Aspen for its time and expenses incurred on CWCAM's behalf and for CWCAM's benefit in situations where such reimbursement is required under the Agreement.

## Parties

### *Plaintiff*

5.  Aspen is a Pennsylvania Limited Liability Company formed under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 275 Commerce Drive, Suite 104, Fort Washington, Montgomery County, Pennsylvania 19034.

6.  Aspen's sole member is its Managing Member, Ethan Giddings ("**Mr. Giddings**"), who is a citizen and resident of the Commonwealth of Pennsylvania.

7.  Aspen is therefore a citizen of the Commonwealth of Pennsylvania.

### *Defendant*

8.  Defendant CWCAM is, upon information and belief, a Limited Liability Company formed under the laws of the State of Delaware with a principal place of business located at 7501 Wisconsin Avenue, Suite 500 West, Bethesda, Maryland 20814.

9.  Upon information and belief, CWCAM's members are citizens of the State of Delaware and the Cayman Islands.

10. CWCAM is, therefore, a citizen of Delaware and the Cayman Islands.

## Jurisdiction and Venue

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (a) complete diversity exists between Plaintiff and Defendant, and (b) the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

12. This Court has personal jurisdiction over CWCAM because:

a) Upon information and belief, CWCAM, as the Special Servicer and/or owner of a large portfolio of real property, has continuous and systematic contacts with the Commonwealth of Pennsylvania, including, but not limited to, servicing real property in the Commonwealth of Pennsylvania and maintaining at least one employee who is a resident of the Commonwealth of Pennsylvania and occasionally works for CWCAM from his residence in Pennsylvania;

b) CWCAM has, in its capacity as Special Servicer, filed an action in this Court in the past; and

c) the events giving rise to this action, as set forth in greater detail below, relate to CWCAM's contract with Aspen in the Commonwealth of Pennsylvania and CWCAM's activities within the Commonwealth of Pennsylvania, including, but not limited to, negotiations and communications with Aspen in Pennsylvania, the entry into a contract with Aspen in Pennsylvania, payments made to Aspen in Pennsylvania, and payments due to Aspen in Pennsylvania; as such, CWCAM it should reasonably anticipate being haled into court in Pennsylvania.

13. Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(a) because:

a) Plaintiffs' claims against CWCAM arise out of, and/or relate to, CWCAM's conduct within this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, as set forth in greater detail below; and

b) Upon information and belief, CWCAM is subject to personal jurisdiction in this District at the time of the filing of this Complaint.

## FACTS

### The Agreement

14. In 2009, Aspen entered into negotiations with CWCAM for the provision of tax consulting services to CWCAM in its capacity as Special Servicer or as owner of certain real estate.

15. Aspen and CWCAM were negotiating an agreement to replace a prior agreement dated August 25, 2004 between CWCAM's predecessor, Allied Capital, and Aspen Tax Partners, an entity that was previously affiliated with Aspen.

16. The negotiations between Aspen and CWCAM occurred by means of telephone calls and emails that were made and sent to Aspen at its location in Montgomery County, Pennsylvania in early 2009.

17. Effective April 3, 2009, Aspen reached an agreement with CWCAM by executing a written integrated Tax Consulting Agreement (the "**Agreement**"). A true and correct copy of the Agreement is attached hereto as Exhibit 1.

18. The Agreement was first signed by CWCAM and then accepted by Aspen in Pennsylvania.

19. At the time that the Agreement was signed, Aspen's only office was its primary office in Pennsylvania, and thus all work performed pursuant to the Agreement was performed by Aspen in Pennsylvania.

20. Later, Aspen added additional offices and employees in other states, but its Pennsylvania office in Montgomery County, Pennsylvania remained its primary office, and as such, remained responsible for (a) supervising and managing the work performed by Aspen

pursuant to the Agreement; (b) invoicing CWCAM for work performed pursuant to the Agreement; and (c) receiving payables and payments due from CWCAM for work performed pursuant to the Agreement.

21. Payments due to Aspen pursuant to the Agreement were to be paid to Aspen in Pennsylvania.

22. All invoices prepared by Aspen for work performed pursuant to the Agreement were issued to CWCAM from Aspen's Pennsylvania office, and those invoices directed CWCAM to make payment to Aspen at its Pennsylvania office.

23. Aspen received wire transfers from CWCAM for payments due for work performed pursuant to the Agreement in Aspen's bank accounts located in Pennsylvania, and Aspen deposited checks received from CWCAM for payments due for work performed pursuant to the Agreement in Aspen's bank accounts located in Pennsylvania.

24. Numerous communications from CWCAM to Aspen regarding Aspen's work performed pursuant to the Agreement were received by Aspen in Pennsylvania.

25. The Agreement is governed by the laws of the State of Maryland. Exh. 1, ¶ 12.

### Aspen's Services To CWCAM Under The Agreement

26. Under the terms of the Agreement, Aspen was to provide certain tax consulting services to CWCAM and earn certain fees as a result of performing those services.

27. More specifically, under the terms of the Agreement, Aspen was to review and evaluate the assessed values of certain real estate properties that were owned or

serviced by CWCAM, and, if appropriate, use its best efforts to seek a reduction in the assessed values of those properties. Exh. 1, at ¶ 2.

28. Aspen's services performed for CWCAM pursuant to the Agreement included: (a) securing and reviewing the tax assessments for the relevant properties for the applicable assessment cycles; (b) preparing valuation and assessment appeal analyses and recommendations regarding assessment appeals; (c) with the concurrence of CWCAM, determining which assessments should be contested; (d) initiating negotiations and/or preparing protests, notices of appeal, or other documents necessary to challenge the assessments, as appropriate; (e) representing CWCAM in valuation negotiations and administrative appeals, as appropriate; (f) tracking and reporting assessment appeal results and verifying assessments and tax liability revisions; and (g) preparing refund claims for prior tax periods and/or securing property tax refunds or credits, as required. *Id.*

### Aspen's Rights To Performance Fees Pursuant To The Agreement

29. In exchange for performing services for CWCAM, Aspen would earn fees that were referred to in the Agreement as "Performance Fees." *Id.*, ¶ 4.

30. The Performance Fees were based upon Schedule B to the Agreement, which provided for fees that were calculated in terms of certain percentages of Tax Savings resulting from Aspen's work. *Id.*, at ¶ 4 and Sched. B.

31. The Agreement defined "Tax Savings" as the difference between the taxes calculated at a property's original or proposed tax assessment, and the taxes calculated at the property's final tax assessment resulting from the appeal or protest for the tax year(s) at

issue (including any penalty abatements and interest paid on savings achieved by Aspen), as well as any refunds or corrected tax bills generated by Aspen's efforts. *Id.*, ¶ 4.

32. In addition, the Agreement's definition of "Tax Savings" for which Aspen could earn Performance Fees included "assessment reductions resulting from [Aspen's] efforts [that] are fixed for one or more years following the resolution of an assessment appeal." *Id.*

33. In that instance, where reductions occurred for one or more years after the resolution of the appeal, Aspen would earn Performance Fees on Tax Savings resulting from such reductions for each year up to the third tax year following the completion of an appeal. *Id.*

34. Where Aspen earned Performance Fees because the benefit of an appeal filed by Aspen was maintained for the tax years following the year the appeal was resolved, Aspen's Performance Fees were calculated at one half (1/2) of the applicable percentages listed on Schedule B to the Agreement.

35. In addition, in certain circumstances, where Aspen was able to successfully negotiate prospective tax assessment cycles prior to the enrollment of assessments and the issuance of proposed assessment notices, Aspen would earn Performance Fees based on the reduction in the assessed value as compared to the prior year's final assessment, unless CWCAM and Aspen agreed to some alternative fee structure. *Id.*

36. Performance Fees were due to Aspen within thirty (30) days after they were billed to CWCAM. *Id.*

37. The Agreement expressly contemplated that, in some jurisdictions, the Tax Savings would be realized through revising billings or credits that might occur many months following the documented assessment reduction. *Id.*

38. Nevertheless, Performance Fees were considered earned and payable under the Agreement upon documentation of an assessment reduction, regardless of the time and manner that the related Tax Savings was ultimately realized by CWCAM or any subsequent owner of the assessed property. *Id.*

39. Thus, for example, if CWCAM owed Aspen its Performance Fees for tax years following the year an appeal was resolved at the time that CWCAM elected to sell a particular assessed property, CWCAM was still obligated to compensate Aspen for those Performance Fees, regardless of whether the Tax Savings would be ultimately realized by CWCAM or the subsequent owner.

40. In other words, under the terms of the Agreement, CWCAM was obligated to pay Aspen its Performance Fee regardless of whether it sold the relevant property or not; CWCAM's payment obligation to Aspen was not dependent upon allocating the tax savings between itself and any eventual purchaser of the subject property, nor was it in any way dependent upon obtaining full or partial reimbursement of Aspen's Performance Fees from the buyer of the property.

41. The Agreement also expressly contemplated that, in the event that CWCAM elected to sell a property for which Aspen had an assessment appeal in process, CWCAM would still be obligated to compensate Aspen for its Performance Fees based on the total Tax Savings for all tax years under appeal at the time of sale, regardless of whatever allocation or proration of any eventual tax savings might be between the buyer and seller. *Id.*

42. The Agreement expressly provided that CWCAM would be solely responsible for paying attorney fees, court filing fees, and/or other professional fees incurred in

conjunction with the work performed by Aspen pursuant to the Agreement, including environmental studies, engineering studies, appraisal fees, and expert witness fees. *Id.* at ¶ 6.

### The Right To Discontinue Work On Specific Properties Under The Agreement

43. During the term of the Agreement, both Aspen and CWCAM had the right to elect to discontinue work on any specific engagement, or any part thereof, where either party determined that the continued provision of services would not be cost-effective. *Id.* at ¶ 6.

44. If Aspen elected to discontinue its work during the term of the Agreement, it had an obligation to work with CWCAM to transition the work to another suitable tax representative of CWCAM in an orderly way. *Id.*

45. If, during the term of the Agreement, CWCAM elected to discontinue the tax appeal process after Aspen had determined that an appeal was warranted and had expended time in preparing a property tax reduction case, CWCAM was required to compensate Aspen for all of its time and expenses incurred on that work. *Id.*

46. Thus, the Agreement did not provide CWCAM with the authority to discontinue Aspen's work with regard to a particular appeal and then transfer the tax appeal work that was in process to another tax representative or service provider.

47. To the contrary, while the Agreement was in effect, the Agreement only provided CWCAM with the option to terminate the tax appeal process altogether for a specific property (and then compensate Aspen for its time and expense).

48. The Agreement also provided the parties with the option to terminate the Agreement altogether.

### The Term (And Termination) Of The Agreement

49. The term of the Agreement continued from its effective date until either party, Aspen or CWCAM, received thirty (30) days' advance written notice of termination from the other party. Exh. 1 at ¶ 1.

50. The Agreement contained an express caveat, however, that, in the event that it was terminated, "any tax appeal in progress when this Agreement is terminated *shall be allowed to continue under the management of [Aspen] to completion* subject to the remaining terms thereof." *Id.* (emphasis added).

51. Thus, upon termination of the Agreement, Aspen had a contractual right to continue performing services on any tax appeals that were in progress at the time of termination, and Aspen had the right to earn its Performance Fees for those appeals pursuant to the same terms and conditions that applied during the term of the Agreement. *Id.*

### CWCAM's Breaches Of The Agreement

52. On or about September 2015, a new Senior Vice President took over the management of CWCAM's Agreement with Aspen.

53. Thereafter, CWCAM began to discontinue Aspen's work on specific property tax appeals even though Aspen's work on those appeals remained cost-effective.

54. At or about that same time, CWCAM asked Aspen to begin providing it with a list of active tax appeals that Aspen was asked to work on, and, in doing so, to identify those appeals on the list with the largest expected tax savings and those appeals on the list that Aspen would recommend terminating based on its understanding of CWCAM's criteria for pursuing or terminating appeals.

55. CWCAM began using Aspen's list as a means to misrepresent that Aspen had requested or recommended that it withdraw or terminate certain appeals when, in actuality, it was CWCAM itself that had instructed Aspen to terminated or withdraw those appeals.

56. Moreover, by 2016, CWCAM began to take the position with Aspen that, regardless of the language of the Agreement, it only owed fees to Aspen based on the active tax appeals shown on the list, and that it did not owe Aspen any fees or time incurred for tax appeals that predated the list, were discontinued or were, for any reason, not included on the list.

57. CWCAM also began to take the position with Aspen that, regardless of the language of the Agreement, it did not owe fees to Aspen for tax appeals on properties that CWCAM had elected to sell.

58. CWCAM also began to take the position with Aspen that, regardless of the language of the Agreement, where CWCAM had elected to sell a property, it did not owe fees to Aspen for any tax years following the year an appeal was resolved and the benefit of the appeal was maintained in subsequent years.

59. Further, CWCAM began failing to pay Aspen's invoices and failing to reimburse Aspen for advances made on CWCAM's behalf. A list of the invoices issued by Aspen that are currently past due as of May 6, 2016 and have not been paid by CWCAM is attached hereto as Exhibit 2.

60. Upon information and belief, the sole reason for CWCAM taking these positions and actions was its interests in either reducing the amount that it would have to pay Aspen or avoiding having to pay Aspen altogether.

### CWCAM's Termination Of The Agreement

61. On Monday, February 10, 2016, CWCAM sent Aspen a letter advising that it intended to terminate the Agreement in accordance with Section 1 of the Agreement effective March 10, 2016. A true and correct copy of that February 10, 2016 letter is attached hereto as Exhibit 3.

62. Thereafter, CWCAM ceased payment of nearly all of Aspen's invoices, including invoices that CWCAM had previously represented to Aspen as having been approved for payment.

63. CWCAM also failed to honor its obligation under the Agreement to have Aspen continue to manage any tax appeal that was in progress when the Agreement was terminated to completion.

64. As a result of CWCAM's failure to honor its obligations in this matter, Aspen lost its contractual right to continue to manage those ongoing tax appeals to completion and thereby earn any Performance Fees or other fees to which it would be entitled as a result of that work.

### CWCAM's Wrongful Transition of Aspen's Work To Another Consultant

65. On April 20, 2016, CWCAM sent a letter to Aspen advising that it was "transition[ing] all active property tax appeals from Aspen Resource Group, LLC to Paradigm Tax

Group pursuant to Section 6" of the Agreement. A true and correct copy of CWCAM's April 20, 2016 letter is attached hereto as Exhibit 4.

66. Moreover, CWCAM's April 20, 2016 letter advised that CWCAM "consider[ed] all services provided by Aspen Resource Group, LLC to be concluded." Exh. 4.

67. Section 6 of the Agreement does not provide CWCAM with the right to transition active tax appeal matters from Aspen to another tax representative or consultant; to the contrary, it only permitted CWCAM to terminate tax appeals in their entirety (and then compensate Aspen for its time and expenses incurred to date) or terminate the Agreement altogether (and allow Aspen to proceed with its work on any existing appeals). *See* Exh. 1, ¶ 6.

68. Upon information and belief, CWCAM transferred the active tax appeal work being performed by Aspen pursuant to the Agreement to another tax representative in bad faith and for the purpose of attempting to avoid its obligations to pay Aspen its Performance Fees and other fees due from CWCAM pursuant to the terms of the Agreement.

69. Although Aspen did not agree with CWCAM's wrongful transition of its work to another tax representative, and although Aspen did not consent to CWCAM's blatant breaches of the Agreement, Aspen nevertheless cooperated in good faith with CWCAM's requests that it cease work on its tax appeals and provide CWCAM with the information needed for CWCAM's new tax representative to begin work on those appeals, so that its client, CWCAM, would not suffer any prejudice on its pending tax appeal matters, such as missed deadlines or lapsed settlement offers.

70. In communicating with CWCAM and honoring its requests that it discontinue work that it should have been permitted to retain, Aspen was careful to note that it

was reserving all of, and was not waiving any of, its rights and privileges with regard to the Agreement.

## COUNT ONE
### Breaches of Contract

71. Plaintiff hereby incorporates paragraphs 1 through 70 by reference as though set forth at length herein.

72. Aspen contracted with CWCAM pursuant to the written, integrated Agreement to provide CWCAM with certain tax consulting services in relation to CWCAM. *See* Exh. 1.

73. Aspen performed its obligations under the Agreement.

74. CWCAM breached its Agreement with Aspen by, among other things:

   a) Failing to pay more than $868,000.00 worth of Aspen's past due invoices after they were duly issued and presented to CWAM (see Exh. 2 attached hereto);

   b) Refusing to pay Aspen's Performance Fees for Tax Savings generated where CWCAM has sold the property at issue or other circumstances existed that caused it to fail to personally receive "savings" on the property tax assessments at issue;

   c) Refusing to permit Aspen to continue working on tax appeals that were in progress when the Agreement was terminated and thereby depriving Aspen of its contractual right to earn substantially more than $1 million in anticipated Performance Fees and other fees with regard to those appeals;

   d) In violation of the Agreement and CWCAM's concomitant duties of good faith and fair dealing, transitioning work from Aspen to another tax service

representative, thereby depriving Aspen of its contractual right to earn fees pursuant to the Agreement; and

    e)  Failing to reimburse Aspen for costs that Aspen advanced on CWCAM's behalf and for CWCAM's benefit, such as attorney's fees and appraisal fees.

  75.  Based upon CWCAM's failure to pay Aspen's past due invoices listed in Exhibit 2 hereto, Aspen believes, and therefore avers, that CWCAM intends to, and will also, fail to pay: (a) more than $850,000 in other invoices that have been duly issued and presented to CWCAM by Aspen but are not yet past due, as well as (b) more than $765,000 worth of Performance Fees that have been earned by Aspen but not yet invoiced to CWCAM for various reasons.

  76.  No legal justification or excuse exists for CWCAM's breaches of the Agreement.

  77.  As a proximate result of CWCAM's breaches of its Agreement with Aspen, as set forth in paragraph 74 above, Aspen has suffered substantial and actual injury, loss, and damages, including, but not limited to, monetary damages substantially in excess of One Million Eight Hundred and Sixty-Eight Thousand Dollars ($1,868,000.00), other additional monetary losses, and the loss of other valuable contractual rights.

  WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of plaintiff Aspen Resource Group, LLC and against defendant CWCapital Asset Management, LLC for monetary damages well in excess of $1,879,000.00, plus pre-verdict interest, post-verdict interest, costs, and any other relief that this Court deems just, necessary, proper and/or appropriate.

COUNT TWO
**Declaratory Judgment Action Pursuant To Maryland's Declaratory Judgment Act**

78. Plaintiff hereby incorporates paragraphs 1 through 77 by reference as though set forth at length herein.

79. Genuine and ripe disputes and actual controversies exist between Aspen and CWCAM with regard to questions of construction and interpretation regarding the terms of the written Agreement and the parties' respective rights, privileges, legal relations and remedies pursuant to the Agreement.

80. A declaration of the parties' rights, obligations and legal relations pursuant to the Agreement would terminate the uncertainty and controversy among the parties that give rise to this proceeding and would be of practical assistance to the parties in avoiding the future litigation of their continuing disagreements regarding the proper interpretation of the Agreement.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an Order declaring the following:

a) CWCAM is contractually obligated under the Agreement to pay all of the past due invoices listed on Exhibit 2 and any other invoices duly issued and presented to CWCAM by Aspen, regardless of whether CWCAM itself receives any refund or savings with regard to the properties at issue, and regardless of whether CWCAM still owns the properties at issue;

b) CWCAM is contractually obligated under the Agreement to pay Aspen its Performance Fees calculated at one half (1/2) of the applicable percentages provided on Schedule B to the Agreement for each of the tax years following the year in which an appeal

brought by Aspen was resolved and the benefit of the appeal has been maintained in subsequent years, up to a maximum of three (3) years following the completion of the appeal, regardless of whether CWCAM personally received any refund or savings with regard to the properties at issue, or whether CWCAM still owns the properties at issue;

    c)  CWCAM is contractually obligated under the Agreement to pay Aspen its Performance Fees for any tax appeals that were improperly transitioned to another tax representative other than Aspen, to the extent that those appeals realize any Tax Savings to CWCAM or to any subsequent owner, including, but not limited to, Performance Fees calculated at one half (1/2) of the applicable percentages provided on Schedule B to the Agreement for each of the tax years following the year in which an appeal brought by Aspen was resolved and the benefit of the appeal has been maintained in subsequent years, up to a maximum of three (3) years following the completion of the appeal, regardless of whether CWCAM personally received any refund or savings with regard to the properties at issue, whether CWCAM still owns the properties at issue, or whether CWCAM paid any fees to another tax representative other than Aspen for its services related to the relevant appeal;

    d)  CWCAM is contractually obligated under the Agreement to pay Aspen for its time and expenses incurred in pursuing any appeals that were discontinued by CWCAM prior to the termination of the Agreement, based upon Aspen's good faith estimates of the time spent and commercially reasonable hourly rates;

    e)  CWCAM is contractually obligated under the Agreement to reimburse Aspen for any fees (legal, appraisal or otherwise) that were advanced by Aspen for the benefit of CWCAM; and

        f)        CWCAM must pay all invoices issued by Aspen within thirty (30) calendar days.

## COUNT THREE
(In The Alternative To Counts One and Two)
**Quantum Meruit / Unjust Enrichment**

81. Plaintiff hereby incorporates paragraphs 1 through 80 by reference as though set forth at length herein.

82. In the alternative to the relevant portions of Counts One and Two, in the event that this Court finds that (a) CWCAM was entitled to terminate the Agreement and transition tax appeals that were in progress at the time of the termination to another tax service provider without being obligated to pay Aspen its Performance Fees and/or (b) the Agreement fails to fully address what was to occur under those circumstances, and any of the tax appeals transferred by CWCAM from Aspen to another tax service provider resulted in monetary or other financial or contractual benefits to CWCAM after the Agreement has been terminated as a result of any efforts expended by Aspen prior to the termination of the Agreement, CWCAM will be unjustly enriched if it is allowed to secure and retain such post-termination benefits for itself without duly and fairly compensating Aspen for the value of its time, effort and expenses incurred for the benefit of CWCAM.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of plaintiff Aspen Resource Group, LLC and against defendant CWCapital Asset Management, LLC for additional monetary damages well in excess of $1,000,000.00, plus pre-verdict interest, post-verdict interest, costs, and any other relief that this Court deems just, necessary, proper and/or appropriate.

Respectfully submitted,

**FRIEDMAN SCHUMAN, P.C.**

Date: <u>May 10, 2016</u>        By: _____
Jeffrey S. Feldman, Esq.
Pa. Atty. I.D. No. 80352
101 Greenwood Avenue, 5th Floor
Jenkintown, PA 19046-2636
Tel: 215-690-3824; Fax: 215-635-7212
E-mail: jfeldman@fsalaw.com

*Counsel for Plaintiff Aspen Resource Group, LLC*